Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/09/2016 09:08 AM CDT

- 715 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

Shayla Funk, appellee, v. Lincoln-Lancaster County
Crime Stoppers, Inc., appellee, and
City of Lincoln, appellant.

___ N.W.2d ___

Filed September 9, 2016.    No. S-15-743.

1. **Political Subdivisions Tort Claims Act: Judgments: Appeal and Error.** In actions brought pursuant to the Political Subdivisions Tort Claims Act, the factual findings of the trial court will not be disturbed on appeal unless clearly wrong; however, questions of law are reviewed independently of the decision reached by the court below.

2. **Libel and Slander: Appeal and Error.** Whether a communication is privileged by reason of its character or the occasion on which it was made is a question of law, which an appellate court resolves independently of the determination reached by the court below.

3. **Damages: Appeal and Error.** A fact finder's decision as to the amount of damages will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved.

4. **Libel and Slander: Words and Phrases.** Conditional or qualified privilege comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, on a subject matter in which the author of the communication has an interest, or in respect to which he or she has a duty, public, personal, or private, either legal, judicial, political, moral, or social, made to a person having a corresponding interest or duty.

5. **Libel and Slander.** When a party making a defamatory statement takes no steps to investigate but relies entirely on information received from another without verification, he or she has not acted as a reasonably prudent person and lacks probable or reasonable grounds for making the defamatory statement, in which event the statement may not be protected by a qualified privilege.

- 716 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

6. **Pleadings.** An affirmative defense raises new matter which, assuming the allegations in the petition to be true, constitutes a defense to the merits of a claim asserted in the petition.

7. **Libel and Slander: Trial.** The failure to request a retraction under Neb. Rev. Stat. § 25-840.01 (Reissue 2008) constitutes an affirmative defense which must be raised prior to trial.

8. **Damages: Appeal and Error.** The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved.

9. **Damages: Judgments: Appeal and Error.** With respect to damages, an appellate court reviews the trial court's factual findings under a clearly erroneous standard of review.

10. **Libel and Slander: Damages.** In an action for defamation, the damages which may be recovered are (1) general damages for harm to reputation; (2) special damages; (3) damages for mental suffering, and (4) if none of these are proved, nominal damages.

11. **Rules of the Supreme Court: Pleadings: Notice.** The Nebraska Rules of Pleading in Civil Actions, like the federal rules, have a liberal pleading requirement for both causes of action and affirmative defenses, but the touchstone is whether fair notice was provided.

12. **Actions: Pleadings.** Prayers for equitable relief have no place or role in a law action.

13. **Actions: Pleadings: Equity.** In Nebraska, the essential character of a cause of action and the remedy or relief it seeks as shown by the allegations of the complaint determine whether a particular action is one at law or in equity.

14. **Libel and Slander.** In order to survive as a separate cause of action, a false light claim must allege a nondefamatory statement. If the statements alleged are defamatory, the claims would be for defamation only, not false light privacy.

15. **Trial: Evidence: Appeal and Error.** To constitute reversible error in a civil case, a trial court's admission or exclusion of evidence must unfairly prejudice a substantial right of the litigant complaining about the ruling.

Appeal from the District Court for Lancaster County: Steven D. Burns, Judge. Affirmed in part, and in part vacated.

Jeffery R. Kirkpatrick, Lincoln City Attorney, and Elizabeth D. Elliott for appellant.

- 717 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

Vincent M. Powers, of Powers Law, for appellee Shayla Funk.

Wright, Miller-Lerman, Cassel, and Kelch, JJ., and Moore, Chief Judge.

Kelch, J.

## I. NATURE OF CASE

Shayla Funk sued Lincoln-Lancaster County Crime Stoppers, Inc. (Crime Stoppers), and the City of Lincoln (City) after still images from a video of Funk conducting a legitimate transaction at an automated teller machine (ATM) were placed on the Crime Stoppers Web site with the text "This young lady doesn't look like your typical crook, but she is! She used someone's stolen credit card . . . . If you know who she is, leave us a tip HERE!" The Lancaster County District Court found in Funk's favor and awarded her injunctive relief and damages in the amount of $259,217.60. The City appeals.

## II. BACKGROUND

On May 3, 2013, a West Gate Bank customer reported that his debit card had been stolen and used to conduct an unauthorized transaction. Money had been withdrawn from the customer's account using one of the bank's ATM's.

### 1. Investigation

An officer from the Lincoln Police Department (LPD) began an investigation. The officer met with the bank customer, who provided the officer with a bank statement showing details of the unauthorized transaction. The officer then talked to a teller from the bank and showed him or her the bank statement. From the bank statement, the teller was able to determine which ATM had been used to withdraw the funds. The teller advised the officer that the teller would talk to someone about getting a video of the security camera footage of that ATM.

Sometime later, the officer returned to the bank to retrieve the video. The officer testified that the bank knew what footage

- 718 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

to provide based on the bank's records of the customer's transactions. The video depicted a female walking up to an ATM and using a debit card to withdraw cash.

At trial, the officer testified that he had no reason to believe that the female depicted in the video was not the person who had used the stolen debit card. He testified that he had asked the employees of the bank to give him the surveillance footage of the unauthorized transaction and that is what the employees said they did. He also testified that the customer's detailed bank statement corroborated that the video depicted the unauthorized transaction; the statement showed that the withdrawal was made from an ATM on Cornhusker Highway in Lincoln, Nebraska, on April 29, 2013, and the video depicted the ATM at the same address and on the same date. However, the video did not have a time stamp, and there was no evidence that the officer would have been able to obtain the time of the surveillance from the video's metadata.

The officer was unable to identify the person in the video, so he sent an e-mail to Jared Minary, LPD's audio and video technician, requesting that Minary capture still images from the video and have them posted to the Crime Stoppers Web site. Crime Stoppers is a nonprofit organization that allows people to anonymously provide information about criminal activity. This is achieved either through a Web-based program called TipSoft or through the Crime Stoppers hotline. A "Crime Stoppers" Web site is owned by the City and operated by LPD. The Web site hosts photographs of suspected criminals, links tipsters to TipSoft, and provides the telephone number for Crime Stoppers. Crime Stoppers then provides the information to law enforcement in an effort to solve crimes.

Minary captured still images from the ATM video and forwarded them to Shane Winterbauer, another LPD officer, so that Winterbauer could post them on the Web site. At trial, Minary was asked what he did to make sure he had captured the correct still image to forward to Winterbauer. Minary replied that he verified the characteristics of the person in the

- 719 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

video with the physical characteristics of the suspect as listed in the investigating officer's report. Minary also testified that he e-mailed the images to the officer and that the officer did not indicate anything was wrong with the images. Minary testified that the video did not have a date or time stamp on it, so he could not verify it in that manner.

## 2. Posting on Crime Stoppers Web Site

After receiving the images from Minary, Winterbauer posted them on the Crime Stoppers Web site and added a headline and text. The headline stated, "Takes All Kinds." The text stated, "This young lady doesn't look like your typical crook, but she is! She used someone's stolen credit card and made a fake deposit at the ATM, then withdrew some cash. If you know who she is, leave us a tip HERE!" Winterbauer testified that the language in the text was used to draw attention to the site. The images and text were uploaded onto the Web site on May 17, 2013.

This posting formed the basis for Funk's defamation action against Crime Stoppers and the City. However, evidence of other instances of alleged defamation were received at trial.

On May 22, 2013, the same images posted on the Crime Stoppers Web site were used in a Crime Stoppers segment airing on local television station KOLN/KGIN 10/11 News (10/11). A video of the segment was not preserved for trial, but Winterbauer testified that he had e-mailed 10/11 staff on May 21, advising them of the cases to be highlighted that week, including the case involving Funk.

On May 23, 2013, a link to the Crime Stoppers Web site was posted to the Crime Stoppers Facebook page. The post contained the same text as the Web site, but the photograph in the post showed only Funk's torso and not her face.

As a result of these publications, LPD received multiple tips that the female in the video was Funk. On or about June 15, 2013, the investigating officer interviewed Funk. Funk

- 720 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

admitted that she was the person in the video, but denied using a stolen credit card. After the interview, Funk was cited for unauthorized use of a financial transaction device. Although Funk had identified herself as the person in the video, the post was not removed from the Crime Stoppers Web site or the Facebook page.

Sometime between June 15 and July 18, 2013, 10/11 aired a news broadcast about the Crime Stoppers program. A video of the broadcast was published to the jury. The broadcast explained how Crime Stoppers works and how anonymous tips help officers solve numerous crimes in the area. As part of the story, four examples were provided. One of the examples was the case involving Funk. As still images of Funk and the ATM appeared on screen, a female voice could be heard saying, "ATM video led officers to Sheila [sic] Funk and a stolen credit card." Then, Winterbauer appeared, saying, "We confronted her with the fact that the card was somebody else's and she couldn't come up with an explanation for that." The female voice later states, "Each of these cases were [sic] solved because of information from the public."

On July 5, 2013, Crime Stoppers received a tip, which provided, in relevant part, """She doesn't look like the typical crook because she isn't a crook. You guys are ruining an innocent person's life by putting her picture on 10/11 . . . even after you had her name and she had met with the police."'" Minary immediately removed the post from the Crime Stoppers Web site. However, as of the time of trial, the post was still on Facebook. Prior to trial, Funk never asked that either of the posts be removed.

On July 10, 2013, a subpoena was faxed to Funk's bank, requesting her banking transactions on the days surrounding the crime. The bank responded the same day with records showing that Funk had engaged in a legitimate transaction with her own account the same day. On July 18, the deputy county attorney wrote Funk a letter notifying her that charges were not filed and that she did not have to appear in court.

- 721 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

### 3. Facts Relevant
#### to Damages

At the time of the publication, Funk was working for Grand Island Physical Therapy (GIPT), which required her to do occupational therapy at different schools around Nebraska. She was contracted to work 1,600 hours a year, August to August, for $31 per hour. If Funk worked more than 1,600 hours, she was to earn $32.86 per hour. Funk also received benefits through her employment, including a retirement plan to which her employer matched 5 percent.

At trial, Funk testified that in early July 2013, after representatives of the schools contacted GIPT about the Crime Stoppers incident, Funk was placed on an unpaid leave. Funk testified that after talking to her supervisors about it, she began to look for another job, because she did not feel that they believed her when she told them she was innocent.

On July 18, 2013, Funk e-mailed her supervisor to let him know that she had another job offer in Lincoln and that she was seriously considering that option. Funk testified that she had signed a contract with GIPT for the 2013-14 school year and wanted to see if she could get out of it. Funk's supervisor responded, encouraging Funk to take the job in Lincoln.

On July 22, 2013, Funk submitted her resignation to GIPT. Her contract with GIPT that year was to end August 11. Funk testified that because she had already worked 1,600 hours that year, she would have earned $32.86 per hour for the remainder of her 2012-13 contract. Funk testified that most of her work took place during the school year and that during the months of June and July, she was working only 16 to 24 hours per week. But Funk testified that from August 1 to 11, 2013, she would have been working 40 hours per week.

On the same day that Funk resigned from GIPT, she accepted the job in Lincoln with Select Rehabilitation, which job began on August 19, 2013. Funk testified that no one from Select Rehabilitation questioned her about the Crime Stoppers incident. She testified that when she applied to work at Select

- 722 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

Rehabilitation, she represented that she wanted to quit GIPT because she was "sick of traveling and wanted to change from school-based." The starting pay at Select Rehabilitation was $30 per hour, which was $1 per hour less than her pay with GIPT. At the time of trial, Funk had received a raise and was earning $30.90 per hour. Select Rehabilitation does not match Funk's 401K contributions.

During the time that Funk worked for GIPT, she also worked part time for Quantum Health Professionals to make up the hours that she did not get with GIPT in the summer. The Crime Stoppers incident did not have an effect on her employment with Quantum Health Professionals, but she left that job in 2014 and began working for another company part time. Funk testified that the Crime Stoppers incident did not have any adverse employment impact since she began working for Select Rehabilitation.

At trial, Funk called five witnesses to testify about the effect of the Crime Stoppers incident on Funk and Funk's reputation within the community of Ewing, Nebraska, Funk's hometown. The first two witnesses were Funk's cousins, the third witness was a friend of Funk, the fourth witness was Funk's friend's husband, and the fifth witness was Funk's fiance. All of the witnesses heard about the Crimes Stoppers incident from either Funk, Funk's fiance, or people in Ewing. Although they testified that Funk did not lose any friends over the incident, they believed that it had embarrassed and humiliated Funk. A few of the witnesses testified that some people in Ewing directed comments to Funk that were "poking fun," making jokes like "'everybody hide your debit cards'" when Funk walked into the room.

## 4. PROCEDURAL POSTURE
### AND TRIAL

In March 2014, Funk filed a complaint against Crime Stoppers, alleging that the postings on the Crime Stoppers Web site constituted libel, slander, and defamation, and that it

- 723 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

violated Funk's privacy by placing her in a false light. Funk also alleged that these torts were done in a joint venture with the City. In December 2014, the City was added as a defendant and an amended complaint was filed to reflect the addition. In the City's answer, it raised as affirmative defenses, first, that it was protected by sovereign immunity and, second, that any statements made by the City were made in good faith and without malice and were therefore protected by qualified privilege. The City did not allege that Funk had failed to request a retraction and was therefore limited to special damages pursuant to Neb. Rev. Stat. § 25-840.01 (Reissue 2008). After it was determined that the City had waived immunity under the Political Subdivisions Tort Claims Act by purchasing excess insurance, the case was set for trial.

The claim against Crime Stoppers was submitted to a jury trial, and the claim against the City was submitted to the district court as required by the Political Subdivisions Tort Claims Act. Ultimately, the trials were done at the same time. The City's opening statement was conducted outside the presence of the jury, and the jury was brought in for the opening statements of Funk and Crime Stoppers. At the close of Funk's case, the City moved for directed verdict and, at the close of its own case, renewed the motion; both motions were overruled. In lieu of a closing statement, the City submitted a brief. The City's counsel was excused just before the jury instruction conference and was not present at the conference.

The jury found that Funk had met her burden of proof and was entitled to $75,000 against Crime Stoppers. It was not specified whether these damages were economic, noneconomic, or both. Entry of judgment was deferred pending the court's decision in the case against the City.

After briefs were submitted, the district court found the City liable for defamation. The court's order stated in part:

> [J]udgment is entered in favor of [Funk] and against the [City] in the amount of $259,217.60. Judgment is entered in favor of [Funk] and against [Crime Stoppers] in the

- 724 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

amount of $75,000. The judgment against Crime Stoppers and $75,000 of the judgment against [the City] is a joint and several judgment. The remainder of the judgment against the [City] is its sole obligation. The defendants are ordered to pay the court costs.

In addition to the monetary damages, the court ordered that the City was to publish a retraction, which, among other things, would affirmatively state that LPD had failed to conduct a simple investigation that would have resulted in finding that Funk was innocent.

## III. ASSIGNMENTS OF ERROR

The City assigns, combined and restated, that the district court erred (1) in finding that qualified privilege did not apply, (2) in finding that Funk was entitled to general damages, (3) in finding that the Facebook post was defamatory, (4) in awarding damages not supported by the evidence, and (5) in overruling its motion for directed verdict for the violation of privacy by false light claim.

## IV. STANDARD OF REVIEW

[1] In actions brought pursuant to the Political Subdivisions Tort Claims Act, the factual findings of the trial court will not be disturbed on appeal unless clearly wrong[1]; however, questions of law are reviewed independently of the decision reached by the court below.[2]

[2] Whether a communication is privileged by reason of its character or the occasion on which it was made is a question of law, which an appellate court resolves independently of the determination reached by the court below.[3]

[3] A fact finder's decision as to the amount of damages will not be disturbed on appeal if it is supported by the evidence

---

[1] *Connelly v. City of Omaha*, 284 Neb. 131, 816 N.W.2d 742 (2012).

[2] See, *id.*; *Scholl v. County of Boone*, 250 Neb. 283, 549 N.W.2d 144 (1996).

[3] See *Kocontes v. McQuaid*, 279 Neb. 335, 778 N.W.2d 410 (2010).

- 725 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

and bears a reasonable relationship to the elements of the damages proved.[4]

## V. ANALYSIS

### 1. QUALIFIED PRIVILEGE

The City first assigns that the district court erred by finding that qualified privilege did not apply. The district court determined that the privilege did not apply, because some of the recipients of the communication were located outside of Lincoln and did not have an interest in solving crime in Lincoln. Although our reasoning differs from that of the district court, we agree that qualified privilege did not apply and affirm the district court's finding of the same.

[4] As the district court noted, conditional or qualified privilege comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, on a subject matter in which the author of the communication has an interest, or in respect to which he or she has a duty, public, personal, or private, either legal, judicial, political, moral, or social, made to a person having a corresponding interest or duty.[5]

"Good faith" has been defined in part as "[a] state of mind consisting in (1) honesty in belief or purpose [and] (2) faithfulness to one's duty or obligation."[6] The City argues that the officer *honestly believed*, based upon information provided by the bank, Funk was the person who committed a criminal act and that therefore, the statement is subject to a qualified privilege. Indeed, the officer did testify, "At that point I had no reason to believe that there would be any other person (indiscernible), so I provided the [bank] statements, asked the bank to give me the surveillance footage of that actual transaction and that's what they told me they did."

---

[4] See *Bradley T. & Donna T. v. Central Catholic High Sch.*, 264 Neb. 951, 653 N.W.2d 813 (2002).

[5] *Turner v. Welliver*, 226 Neb. 275, 411 N.W.2d 298 (1987).

[6] Black's Law Dictionary 808 (10th ed. 2014).

- 726 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

On the other hand, Funk argues that the statement was not made in good faith, because the officer failed to take any steps to verify that the video he received from the bank depicted the unauthorized transaction. We find that the officer's failure to investigate relates more to whether he had reasonable or probable grounds for believing the statement to be true. In this case, we determine that the officer did not have such grounds, and therefore the qualified privilege does not apply.

[5] When a party making a defamatory statement takes no steps to investigate but relies entirely on information received from another without verification, he or she has not acted as a reasonably prudent person and lacks probable or reasonable grounds for making the defamatory statement, in which event the statement may not be protected by a qualified privilege.[7]

The critical evidence before the officer was the video of Funk at the ATM. The video had no transactional stamp or time stamp to provide any verification that Funk was the person who committed the unauthorized transaction. The officer testified that when he initially contacted the bank, he was informed that someone from the security department would be able to provide surveillance footage of the unauthorized transaction. The officer later testified that although the video was given to him by a bank teller, he did not know who created it.

The officer relied entirely upon the assertion of a bank employee who, in turn, must have relied upon an assertion of another unknown employee from the bank's security department. Without a transactional stamp or time stamp, the video could be depicting any person who happened to unfortunately use the same ATM on the same day as the unauthorized transaction, which is what happened in this case.

Additionally, the context of the situation needs to be considered. The video was the key evidence used to identify Funk and cite her with a criminal law violation which was intended to lead to a criminal prosecution. Considering the

_____

[7] See *Scott Fetzer Co. v. Williamson*, 101 F.3d 549 (8th Cir. 1996).

serious ramifications of the statement, it would not be unreasonable as part of the duties of an investigating officer to have made further inquiry at the bank. The officer might have asked, for example, whether the person in the video matched the person who was conducting the unauthorized transaction and, if so, how the bank determined that to be correct without a time stamp or transactional stamp. This would not be an onerous requirement. Because there was no evidence that the officer made any inquiries about the video, and, instead, the officer relied entirely on unverified representations made by the bank, we find that the defamatory statement was made without reasonable or probable grounds for believing it to be true. Accordingly, the district court did not err in finding that the publication did not have the protection of a qualified privilege.

## 2. § 25-840.01

The City next assigns that the district court erred in finding that the publication was prompted by actual malice and in awarding Funk general damages. The district court found that Funk was entitled to general damages, despite the City's argument that Funk was limited to special damages pursuant to § 25-840.01. That statute provides, in relevant part:

(1) In an action for damages for [defamation], the plaintiff shall recover no more than special damages unless correction was requested as herein provided and was not published. Within twenty days after knowledge of the publication, plaintiff shall have given each defendant a notice by certified or registered mail specifying the statements claimed to be libelous or to have invaded privacy as provided by section 20-204 and specifically requesting correction. . . . The term special damages, as used in this section, shall include only such damages as plaintiff alleges and proves were suffered in respect to his or her property, business, trade, profession, or occupation as the direct and proximate result of the defendant's publication.

- 728 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

(2) This section shall not apply if it is alleged and proved that the publication was prompted by actual malice, and actual malice shall not be inferred or presumed from the publication.

It is undisputed that Funk failed to request a retraction within 20 days of her knowledge of the publication. However, the district court found that § 25-840.01 did not apply, because it concluded that the publication was prompted by actual malice.

In Funk's brief on appeal, Funk tells us that we need not review the district court's finding of malice, because the City waived the limitation of damages when it failed to raise § 25-840.01 as an affirmative defense prior to trial. Indeed, an affirmative defense must be pleaded to be considered in the trial court and on appeal.[8] The burden of both pleading and proving affirmative defenses is upon the defendants, and when they fail to do so, they cannot recover upon mere argument alone.[9]

[6] Thus, the question becomes whether a "failure to request a retraction" under § 25-840.01 is an affirmative defense. We have said that an affirmative defense raises new matter which, assuming the allegations in the petition to be true, constitutes a defense to the merits of a claim asserted in the petition.[10] The rationale for requiring the defendant to plead a specific defense is to set forth the defense so that the plaintiff may be advised of the exact defense he or she will be required to meet and the trial court may be informed as to the exact issues to be determined.[11]

The City's argument pursuant to § 25-840.01 was a new matter that raised two new issues: (1) whether Funk failed

---

[8] *Nebraska Pub. Emp. v. City of Omaha*, 244 Neb. 328, 506 N.W.2d 686 (1993), *disapproved on other grounds, Salkin v. Jacobsen*, 263 Neb. 521, 641 N.W.2d 356 (2002).

[9] *Id.*

[10] *Id.*

[11] *Id.*

- 729 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

to timely request a retraction and (2) whether the publication was prompted by actual malice. If the City proved that Funk failed to timely request a retraction, the City would not be liable for general damages, unless Funk proved that the publication was prompted by actual malice. Because the City did not plead "failure to request a retraction" as an affirmative defense, Funk was not on notice that she would be required to prove actual malice to rebut the statutory defense set forth by § 25-840.01.

Further, although defamation is an intentional tort, an analogy can be drawn from affirmative defenses in negligence actions. For example, a defendant seeking to mitigate damages in a negligence action by reason of contributory negligence must raise the issue of contributory negligence prior to trial in order to successfully reduce damages.[12] Here, the City was also seeking to mitigate damages, albeit by reason of Funk's failure to request a retraction. Just like in a negligence action, the City was required to raise the mitigation of damages issue prior to trial.

[7] We therefore conclude that the failure to request a retraction under § 25-840.01 constitutes an affirmative defense which must be raised prior to trial. Because the City failed to raise such defense, we find that it does not apply and that Funk is entitled to general damages.

### 3. FACEBOOK

The City next assigns that the district court erred in finding that the Facebook post was defamatory, because the person depicted in the photograph on the post is unidentifiable. The district court found that the Facebook post was defamatory and "embarked upon by the City alone," and the court used the Facebook post as a justification for awarding Funk additional damages beyond those awarded by the jury in the trial against Crime Stoppers.

---

[12] See, Neb. Rev. Stat. § 25-21,185.09 (Reissue 2008); *Hill v. City of Lincoln*, 249 Neb. 88, 541 N.W.2d 655 (1996).

- 730 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

Although the Facebook photograph depicts only Funk's torso, the page links viewers to the post on the Crime Stoppers Web site, where the full image can be seen. The City admits that the post on the Crime Stoppers Web site is defamatory. It is self-evident that regardless of whether the Facebook post is defamatory, the posting of the link on Facebook increased the readership of the post on the Crime Stoppers Web site and likewise the harm to Funk's reputation. Therefore, we conclude that the district court properly considered the Facebook post in awarding damages, and we need not determine whether the post by itself was defamatory.

## 4. Damages

As noted, the district court awarded Funk damages in the amount of $259,217.60, with $75,000 of that amount being owed jointly and severally with Crime Stoppers. It also ordered the City to publish several retractions. On appeal, the City argues that the damages awarded by the district court were improper, because they were based on speculation and conjecture. The City also argues that the award of injunctive relief was improper, since such relief was not requested. After considering each issue in turn, we affirm the district court's award of monetary damages, but reverse the award of injunctive relief.

### (a) Monetary Damages

The City argues that the damages awarded by the district court were speculative and conjectural. To support its argument, the City points to statements in the damages section of the August 5, 2015, order, such as: "At any time [the Crime Stoppers incident] could impact [Funk's] credit rating, her ability to obtain a loan or mortgage, . . . even her potential for custody in a custody of children dispute." The City argues that the district court's award of general damages was improper, because there was no evidence on the effect of Funk's credit rating, her ability to obtain a loan or mortgage, or her potential for custody. The City made similar arguments with respect to

- 731 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

other comments made by the district court. However, the City glossed over the district court's discussion on harm caused to Funk's reputation and mental well-being.

[8,9] The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved.[13] With respect to damages, an appellate court reviews the trial court's factual findings under a clearly erroneous standard of review.[14]

[10] Under this standard of review, we must affirm the district court's award of damages, because the award is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. In an action for defamation, the damages which may be recovered are (1) general damages for harm to reputation; (2) special damages; (3) damages for mental suffering, and (4) if none of these are proved, nominal damages.[15]

Sufficient evidence supports that Funk's reputation was harmed as a result of the City's defamatory statements. Not only does the evidence show that the statements affected Funk's personal reputation in her hometown of Ewing, but it is also clear that Funk's reputation was harmed in the context of her employment with GIPT. Further, sufficient evidence also supports that Funk endured some emotional suffering. Numerous witnesses testified that the statements embarrassed and humiliated Funk. Additionally, Funk's fiance confirmed that Funk was embarrassed and humiliated, and he revealed that Funk lost sleep over the incident.

---

[13] *BSB Constr. v. Pinnacle Bank*, 278 Neb. 1027, 776 N.W.2d 188 (2009); *Lacey v. State*, 278 Neb. 87, 768 N.W.2d 132 (2009); *State ex rel. Stenberg v. Consumer's Choice Foods*, 276 Neb. 481, 755 N.W.2d 583 (2008); *Eicher v. Mid America Fin. Invest. Corp.*, 275 Neb. 462, 748 N.W.2d 1 (2008); *Roth v. Wiese*, 271 Neb. 750, 716 N.W.2d 419 (2006).

[14] *Bedore v. Ranch Oil Co.*, 282 Neb. 553, 805 N.W.2d 68 (2011).

[15] *McCune v. Neitzel*, 235 Neb. 754, 457 N.W.2d 803 (1990).

- 732 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

With regard to the amount of damages sustained, Funk was simply required to offer sufficient proof of damages so that the fact finder could reach its award without awarding an uncertain, speculative recovery.[16] As we have said before, "The amount of damages for pain, suffering, and emotional distress inherently eludes exact valuation."[17] Accordingly, we find that there was sufficient evidence to support the district court's award of monetary damages, and therefore find that the City's assignment of error with respect to damages is without merit.

### (b) Equitable Relief

[11] The City also argues that the district court erred in awarding injunctive relief, because such relief was not requested in Funk's complaint. The Nebraska Rules of Pleading in Civil Actions, like the federal rules, have a liberal pleading requirement for both causes of action and affirmative defenses, but the touchstone is whether fair notice was provided.[18] This is the same standard adopted by the federal courts.[19]

We agree with the City that the averments in Funk's complaint do not raise the issue of retraction or any other equitable relief. Nowhere in Funk's second amended complaint does she request a retraction. Funk claimed only to have "suffered damages including the loss of her employment, loss of wages, humiliation, inconvenience, mental anguish, loss of earning capacity and damage to her reputation."

[12] In countering, Funk claims that she did request equitable relief and points to the prayer in her complaint which states, "WHEREFORE [Funk] seeks damages in an amount, which will fairly and justly compensate her together with the

---

[16] See *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993).

[17] *Id.* at 823, 503 N.W.2d at 183.

[18] *Weeder v. Central Comm. College*, 269 Neb. 114, 691 N.W.2d 508 (2005).

[19] See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

- 733 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

costs of this action and *such other and further relief as the Court deems just*." (Emphasis supplied.) However, in actions at law, we have stated that such general prayers for equitable relief are mere surplusages and "gratuitous phrase[s]," reasoning that prayers for equitable relief have no place or role in a law action.[20] Although these statements were made while Nebraska was a code-pleading state, we find no reason why this principle does not apply to notice pleading as well.

[13] The action initiated by Funk was clearly an action at law. In Nebraska, the essential character of a cause of action and the remedy or relief it seeks as shown by the allegations of the complaint determine whether a particular action is one at law or in equity.[21] Despite the gratuitous phrase in Funk's prayer, the essential character of Funk's cause of action for defamation was in law for damages and not for equity. Accordingly, with this being an action at law for damages, Funk was not entitled to equitable relief.

Because Funk filed her complaint as an action at law for damages and not for equitable relief, we need not and do not consider whether equitable relief in the form of a retraction is an available remedy in a libel action. Although the attractiveness of the district court's equitable relief is not lost upon this court, we find the district court had the authority to award only damages, and the portion of the district court's order granting equitable relief is hereby vacated.

## 5. FALSE LIGHT

[14] Finally, the City claims that the district court erred in overruling its motion for a directed verdict for the violation of privacy by false light claim. The City argues that a statement

---

[20] See *Tobin v. Flynn & Larsen Implement Co.*, 220 Neb. 259, 262, 369 N.W.2d 96, 99 (1985). See, also, *Waite v. Samson Dev. Co.*, 217 Neb. 403, 348 N.W.2d 883 (1984); *Doak v. Milbauer*, 216 Neb. 331, 343 N.W.2d 751 (1984).

[21] *Genetti v. Caterpillar, Inc*, 261 Neb. 98, 621 N.W.2d 529 (2001); *Dillon Tire, Inc. v. Fife*, 256 Neb. 147, 589 N.W.2d 137 (1999).

- 734 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
FUNK v. LINCOLN-LANCASTER CTY. CRIME STOPPERS
Cite as 294 Neb. 715

alleged to be both defamatory and a false light invasion of privacy is subsumed within the defamation claim and is not separately actionable. Indeed, we have stated that "'[i]n order to survive as a separate cause of action, a false light claim must allege a nondefamatory statement. If the statements alleged are defamatory, the claims would be for defamation only, not false light privacy.'"[22]

[15] However, to constitute reversible error in a civil case, a trial court's admission or exclusion of evidence must unfairly prejudice a substantial right of the litigant complaining about the ruling.[23] The City fails to alert the court as to how this ruling unfairly prejudiced the City, and it appears that the district court attempted to award damages only for one cause of action—defamation. We therefore conclude that this assignment of error is without merit.

## VI. CONCLUSION

For the foregoing reasons, we affirm the district court's finding that the communication was not made pursuant to a qualified privilege and its finding that Funk was entitled to both general and special damages. We also affirm the district court's monetary award. However, we vacate the district court's award of equitable relief.

AFFIRMED IN PART, AND IN PART VACATED.

HEAVICAN, C.J., and CONNOLLY and STACY, JJ., not participating.

---

[22] *Moats v. Republican Party of Neb.*, 281 Neb. 411, 428, 796 N.W.2d 584, 598 (2011) (quoting *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188 (9th Cir. 1989), and citing *Time, Inc. v. Hill*, 385 U.S. 374, 87 S. Ct. 534, 17 L. Ed. 2d 456 (1967)).

[23] *Tolliver v. Visiting Nurse Assn.*, 278 Neb. 532, 771 N.W.2d 908 (2009).